# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 22-0701V

| | |
|---|---|
| KRISTINA LEMON,<br><br>     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>     Respondent. | Chief Special Master Corcoran<br><br>Filed: May 23, 2024 |

*Paul R. Brazil*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Emilie Williams*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On June 22, 2022, Kristina Lemon filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered from Guillain-Barré syndrome ("GBS") following an influenza ("flu") vaccine she received on October 26, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters, and although Respondent conceded entitlement, the parties were not able to settle damages.

After hearing argument from the parties at a "Motions Day" proceeding, I find that Petitioner is entitled to an award of damages in the amount of **$149,370.00**, **representing $145,000.00 in actual pain and suffering, plus $4,370.00 in unreimbursed out-of-pocket expenses.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.     Relevant Procedural History

Nine months after this case was filed, Respondent filed a Rule 4(c) Report conceding entitlement. ECF No. 19. After a brief period of negotiations, the parties determined that they could not resolve damages on their own. ECF No. 24. Petitioner thereafter filed a Brief in Support of Damages ("Br.") on August 8, 2023. ECF No. 25. Respondent filed a responsive brief ("Resp.") on September 26, 2023. ECF No. 26. I proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed issues. ECF No. 29. That hearing was held on May 17, 2024, and the case is now ripe for resolution.

## II.     Relevant Medical History

Petitioner, a former firefighter, received a flu vaccine on October 27, 2020. Ex. 1 at 38. Her medical history included a cervical fusion, a right knee replacement, chronic pain from work-related injuries sustained in a building collapse in 2006, PTSD, anxiety and depression. See Petition at ¶4; Ex. 1 at 70-72; Ex. 2 at 23-25.

On November 12, 2020 (16 days after vaccination), Petitioner went to the emergency room complaining of decreased sensation and weakness in her lower extremities that began the previous day. Ex. 4 at 20. She also reported shortness of breath and a constricted feeling in her chest. *Id*. She was admitted for evaluation and had normal EKG and MRI exams. *Id*. at 22. The following day, during a neurological exam, Petitioner reported numbness in her hands and feet, generalized weakness, and dyspnea, and her deep tendon reflexes were absent. *Id*. at 95-96. She was started on IVIG. *Id*. at 70. A lumbar puncture was attempted on November 14, but was unsuccessful. *Id.* at 76. A second, ultrasound guided lumbar puncture was successful on November 16, and revealed albumin-cytologic dissociation, indicating GBS. *Id*. Petitioner was hospitalized through November 17, 2020, when she was discharged to her home. *Id.* at 76.

Petitioner received home health care services, including in-home occupational therapy, physical therapy, and speech therapy, from November 19, 2020, through January 8, 2021. Ex. 8. At her last visit, Petitioner was deemed to be "independent in the home." *Id.* at 11. At that time, she had met most of her therapy goals, but continued to have mild balance issues without support and had not yet mastered normal swallowing or oral function. *Id.* at 12-13.

On December 8, 2020, Petitioner established care with an outpatient neurologist. Ex. 5 at 3-5. She reported minimal improvement during her hospitalization and complained of a new left facial nerve palsy. *Id*. at 3. She also noted that she was

experiencing continued numbness in her arms, hands, trunk, and glutes, causing difficulty with gait (although she could stand and walk around). *Id.* On exam, Petitioner had a left facial droop, and was unable to lift her left eyebrow or completely close her left eye. *Id*. at 4. She was prescribed prednisone, eye drops, and an eye patch, and was advised to continue physical and occupational therapy. *Id.* at 5. Repeat MRIs (brain and c-spine) and an EMG were ordered. *Id.*

An EMG performed on December 28, 2020, revealed "a severe an predominantly demyelinating polyneuropathy affecting legs greater than arms." Ex. 5 at 13. Petitioner followed up with her neurologist on January 4, 2021. *Id.* at 9. She reported improvement with her facial symptoms, but that she still struggled with ADLs. *Id.* Petitioner had also experienced a fall in a parking lot, which injured her left knee and numbness from her feet up to her diaphragm and in both hands up to mid-forearm. *Id.* She continued to be areflexic. *Id.* at 10. Although the doctor considered progression to CIDP, he noted that her symptoms had been persistent and improving, and not progressing. *Id*. at 11. He advised her to continue taking gabapentin and to establish care with a neurologist in Seattle after her imminent move. *Id.*

On February 5, 2021, Petitioner established care with a new primary care provider ("PCP") in Seattle. Ex. 6 at 82-84. Petitioner now reported feeling back to 50% of her baseline, but noted continued lack of coordination and balance, difficulty with writing, fatigue, blurry vision, excess tearing in her eyes, pain in her legs, and numbness/tingling in her hands and feet. *Id.* at 83-84. On exam, she displayed "some residual left sided facial droop" and numbness, decreased strength and sensation in her extremities, and a slightly ataxic gait. *Id.* at 85-86. She was referred to physical and occupational therapy, and to sports medicine for evaluation of her knee injury. *Id.* at 83.

Petitioner established care with a neurologist in Seattle on February 10, 2021. Ex. 6 at 63-66. She was experiencing continued numbness throughout her body, although she could walk her dog for half a mile and do "normal activity," but felt tired after standing for 20 minutes and at the end of the day. *Id*. at 63. She was cautious with swallowing. *Id.* The doctor planned a repeat EMG in one month. *Id.* at 66

Petitioner followed up with her neurologist on April 28, 2021. Ex. 6 at 76.  She reported that the numbness in hands and feet had improved, but numbness in her face and mouth had worsened. *Id.* A repeat EMG on April 30, 2021 was consistent with "resolving demyelinating peripheral polyneuropathy." *Id*. at 78, 90-91.

During PCP visits in 2021 and 2022, Petitioner continued to state that she was experiencing residual symptoms of GBS, including reduced sensation in her hands,

fatigue, and left sided facial symptoms, but she did not provide evidence of further treatment for her GBS sequelae. Ex. 9 at 36-37; Ex. 6 at 67.

### III. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision from

several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it offers a reasoned understanding of the issues involved in pain and suffering calculations.

### IV.  Appropriate Compensation for Petitioner's Pain and Suffering

In this case, Petitioner's awareness of her injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her GBS. Therefore, my analysis focuses primarily on the severity and duration of Petitioner's injury.

Petitioner's medical records reveal a moderate case of GBS, with a treatment course that was not exceedingly intrusive compared to other cases. Petitioner was diagnosed fairly quickly after an EKG, MRI, and two lumbar punctures. She had a six-day hospital stay with five IVIG infusions before she was discharged to her home. She did not require subsequent inpatient rehabilitation, but received various therapies in her home for approximately 2.5 months more. Petitioner stopped treating her GBS about six months after her vaccination, but the medical records confirm that she suffered continuing numbness in her extremities, fatigue, and difficult facial symptoms for approximately another year.

Petitioner cited four cases in her brief, with pain and suffering awards ranging from $155,000.00 to $165,000.00. Mot. at 5-6. Overall, these comparable cases were more relevant to my determination herein than those offered by Respondent. The most helpful of Petitioner's cases was *Robinson v. Sec'y of Health & Human Servs.*, No. 18-0088V, 2020 WL 5820967, *2-3 (Fed. Cl. Spec. Mstr. Aug. 27, 2020), where the petitioner was awarded $160,000.00 in pain and suffering after a six-day hospital stay, five IVIG infusions, and 20 sessions of outpatient physical therapy after discharge. That petitioner also endured several diagnostic tests, including two lumbar punctures. *Id*. at *2. She also did not require inpatient rehabilitation, recovered quickly, and experienced mild sequela. *Id*. at 2-3. The *Robinson* petitioner, however, endured significant distress at the beginning of her treatment course as doctors struggled to diagnose her, causing her "to question whether she would survive or not," and her course was complicated by tachycardia. *Id*. at

5

*2, 6. She also experienced disturbances in parenting her young children. Ms. Lemon, in contrast, was diagnosed and treated quickly, did not suffer significant complications,[3] and did not suffer major life disturbances (such as to parenting or employment), suggesting that a lower award is appropriate.

*Weil v. Secretary of Health & Human Services*, 2023 WL 1778281, No. 21-0831V (Fed. Cl. Spec. Mstr. Feb. 6, 2023) is another helpful (and more recent) case. That petitioner was awarded $140,000.00 in pain and suffering after being hospitalized for five days, receiving IVIG treatment, and spending 20 days in inpatient rehab, after which he recovered quickly. *Id*. at *1-2. He had outpatient physical therapy for approximately one month and used a walker after his return home. *Id.* Although Ms. Lemon did not spend time in inpatient rehabilitation, she endured several more diagnostic tests than the *Weil* petitioner, had more outpatient therapies, including speech therapy for her facial symptoms, and suffered ongoing sequela for significantly longer than did the *Weil* petitioner, suggesting that a slightly higher award is warranted.

The appropriateness of a future pain and suffering component is also disputed. Petitioner argues that her ongoing GBS symptoms justify an award of future pain and suffering for the remainder of Petitioner's life expectancy. Br. at 8. However, it is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery. Although certainly Petitioner continues to experience sequelae and has not fully returned to her pre-GBS baseline, she has not provided sufficient evidence to support her claim for future pain and suffering (such as evidence showing ongoing treatment or significant impacts on employment). In fact, Petitioner has not provided evidence of any medical treatment for her GBS symptoms in the recent past, nor has she provided evidence of current sequelae that are more severe than those experienced in many GBS cases.

After considering the entire record and the parties' arguments, I find that **$145,000.00 in compensation for actual pain and suffering** is reasonable and appropriate in this case, with no future component awarded.

## V. Award for Past Unreimbursed Expenses

Petitioner requests **$4,370.00 in past unreimbursed out-of-pocket expenses**. Br. at 1. Respondent does not dispute this sum, and therefore Petitioner is awarded it without adjustment. Resp. at 7.

---

[3] Petitioner did complain of shortness of breath and chest tightness during her acute illness, but she did not require any specialized treatment, such as intubation.

**Conclusion**

For all of the above reasons, the I award **Petitioner a lump sum payment of $149,370.00 (representing $145,000.00 for Petitioner's actual pain and suffering and $4,370.00 for past unreimbursed out-of-pocket expenses) in the form of a check payable to Petitioner, Kristina Lemon.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[4]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[4] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.